SACKS REALTY CO., PLAINTIFF, v. LOREEN BATCH, ANN THEODORE, GERARD MONTERA, JOSEPHINE LOMBARDI, TILLIE HARRISON, JOHN GOGARTY, AND CHRISTOS CHARLAMBOUS, DEFENDANTS.

Superior Court of New Jersey
Law Division Special Civil Part
Bergen County

Decided May 24, 1989.

270

*John J. Curley* for plaintiff (*Lepis, Lepis & Curley*, attorneys).

*Kevin G. Roe* for defendants.

HARRIS, J.S.C.

## I.

### *Introduction.*

This landlord-tenant action explores the outer limits of the power and the discipline of the court in connection with a summary dispossess action grounded upon the permanent retirement of real property from residential use. This case raises sensitive issues concerning the separation of powers between the Judiciary and the Legislature, and demands a careful analysis of the legislative intent of the 1986 amendments to the Anti-Eviction Act, N.J.S.A. 2A:18-61.1 *et seq.* For the reasons which follow, the court determines that the failure of plaintiff to have scrupulously followed *all* notification procedures mandated by the 1986 amendments to the Anti-Eviction Act, requires that its complaints[1] against the seven remaining tenants, in this mostly abandoned building, be dismissed.

## II.

### *Procedural Posture of the Action.*[2]

On June 24, 1987, plaintiff, as managing agent[3] of the real property which is the subject matter of this litigation, mailed

---

[1] Plaintiff commenced seven separate actions against individual tenants seeking termination of their tenancies for good cause under *N.J.S.A.* 2A:18-61.1(h). Since the cases presented near-identical fact patterns, they were consolidated on the court's motion, and tried as one action.

[2] A prior chapter in this action was written between 1986 and 1988 when plaintiff became entangled in the changed notice requirements under the Anti-Eviction Act effectuated by *L.*1986, *c.* 138. In 1986, plaintiff gave these defendants six months notice of termination of their tenancies because of the permanent retirement of the building from residential use. After the Legislature amended *N.J.S.A.* 2A:18-61.2(d) to require 18 months notice, plaintiff's complaints were dismissed. This dismissal was affirmed by the Appellate Division in an unreported opinion in 1988.

[3] See *N.J.S.A.* 2A:18-51 for the managing agent's authority to pursue this action in its name.

(by certified mail, return receipt requested) to each defendant a notice terminating their tenancy and demanding possession of the premises on December 31, 1988 because plaintiff intended to permanently retire the building in which the tenants were living from residential use. Each tenant received a notice on or before July 3, 1987.

On January 10, 1989, plaintiff commenced this action by filing seven identical complaints alleging plaintiff's right to a judgment of possession by virtue of its compliance with *N.J. S.A.* 2A:18–61.1(h). An initial trial date of February 3, 1989 was scheduled in accordance with *R.* 6:5–2, but it was adjourned pending the result of defendants' motion pursuant to *N.J.S.A.* 2A:18–60 to transfer the actions. *See R.* 6:4–1(g). The transfer motion was denied, and the matter commenced trial on April 6, 1989.

Defendants made a number of motions to dismiss the action during plaintiff's case, and at its conclusion (in accordance with *R.* 4:37–2(b)), but all were denied to enable a full record to be developed.

## III.

### *Findings of Fact.*

Plaintiff is the managing agent for Tri–State Capital Corp. of real property located in the Borough of Fort Lee, commonly known as 2025 Lemoine Avenue. It is a 22–unit building presently adapted to residential use which the owner intends to retrofit and convert to office/commercial uses, in apparent conformity with local land use regulations. In so doing, the property will be completely retired from residential use[4].

---

[4]See *Chambers v. Nunez,* 217 *N.J.Super.* 202 (Law Div.1986) requiring the *entire* building to be permanently retired, not just a portion thereof.

Notices terminating defendants' tenancies were mailed and received by defendants at least 18 months prior to the institution of the instant action. However, plaintiff neglected to comply with *N.J.S.A.* 2A:18–61.1c (requiring plaintiff, within five days of mailing the tenants' notice of termination, to advise the Department of Community Affairs of the permanent retirement of the building from residential use), and *N.J.S.A.* 2A:18–61.1d (requiring plaintiff, within five days of mailing the tenants' notice of termination, to advise the Fort Lee Rent Leveling Board of the permanent retirement of the building from residential use, and listing the existing tenancies and their rents).

On January 10, 1989, the day these summary dispossess actions were initiated, plaintiff finally sent to the Department of Community Affairs and the Fort Lee Rent Leveling Board notice that should have been provided over 18 months earlier.

As of the trial date, plaintiff was in possession of a partial demolition permit from the Borough of Fort Lee to enable it to begin the process of rehabilitation leading ultimately to its permanent retirement from the residential rental market. Plaintiff claims that it need not obtain site plan approval from Fort Lee [5] since its intended office/commercial use is a primary permitted use in the zone in which it is located. *Cf. Dresner v. Carrara*, 69 *N.J.* 237 (1976). Plaintiff further contends that it is precluded from proceeding with further development permits until an architectural and engineering study is completed. These studies require removal of all tenants in order to be accomplished. Plaintiff asserts that it was not involved in the construction of the building and there are no blueprints, schematics, or other plans available to it. Thus, it claims that an

---

[5]This is belied by section 18-3.1 of the Fort Lee code which requires site plan approval before a building permit is issued in connection with any change in use.

on-site investigation—in the absence of these tenants—must be conducted before full, final plans may be prepared and submitted for a building permit from the local building department. Plaintiff claims that these unusual circumstances entitle it to proceed in this action notwithstanding the otherwise conceded noncompliance with *N.J.S.A.* 2A:18–61.1b.

Defendants produced each tenant as a witness for the purpose of indicating that neither the landlord nor any public agency had made any attempt whatsoever to offer or provide relocation assistance, comparable housing, or moving expenses. These witnesses also testified that they had each made complaints to plaintiff about the conditions of their apartments (largely limited to water and ceiling damage) and to the local building department. Defendants have relied upon these complaints as the primary basis for claiming the benefits of *N.J. S.A.* 2A:42–10.10 *et seq.*, which precludes retaliatory evictions.

IV.

*Conclusions of Law.*

A.

*Obtaining Necessary State or Local Permits or Approvals.*

Plaintiff has admitted that it has not yet obtained all of the necessary state and local permits or approvals in order to transform the property into an office/commercial use. It seeks to be excused from the mandate of *N.J.S.A.* 2A:18–61.1b on the basis of *impracticality* of performance, a creative theory of law, to say the least. It relies upon the opinion of its architect for the proposition that a structural engineer will not conduct the comprehensive analysis of the building for purposes of preparing plans for a building permit until all tenants are removed. This appears to create a problem of circularity since the studies cannot be conducted unless the tenants are re-

moved, and the tenants cannot be removed under the literal language of the statute until all permits are obtained, and all permits cannot be obtained until the studies are conducted. If this be the law, then plaintiff is caught in an never-ending Catch-22 [6].

N.J.S.A. 2A:18-61.1b provides in pertinent part as follows:

No tenant shall be *evicted* pursuant to subsection h. of section 2 of P.L.1974, c. 49 (C.2A:18-61.1) if any State or local permit or approval required by law for the nonresidential use is not obtained. Nothing contained in this section shall be deemed to require obtaining a certificate of occupancy for the proposed use prior to an eviction. [Emphasis supplied]

The most noteworthy feature of this statute is its use of the word "eviction," rather than "judgment of possession," which is found, for example, in N.J.S.A. 2A:18-61.2 [7]. This shift in terminology is not accidental; it is purposeful and evinces a clear message that the failure to satisfy the conditions precedent to the actual removal of a tenant from the property (an eviction) will not preclude the entry of a judgment of possession where appropriate. If the Legislature intended that *judgment* be entered only if all necessary permits or approvals were

---

[6] Joseph Heller, *Catch-22* (1955). "There was only one catch and that was Catch-22, which specified that a concern for one's own safety in the face of dangers that were real and immediate was the process of a rational mind. Orr was crazy and could be grounded. All he had to do was ask; and as soon as he did, he would no longer be crazy and would have to fly more missions. Orr would be crazy to fly more missions and sane if he didn't, but if he was sane he had to fly them. If he flew them he was crazy and didn't have to. Yossarian was moved very deeply by the absolute simplicity of this clause of Catch-22 and let out a respectful whistle. 'That's some catch, that Catch-22,' he observed. 'It's the best there is,' Doc Daneeka agreed." *Id.* at 47.

[7] "No judgment of possession shall be entered for any premises covered by section 2 of this act, except in the nonpayment of rent under paragraph a. or f. of section 2, unless the landlord has made written demand and given written notice for delivery of possession of the premises." N.J.S.A. 2A:18-61.2; see also N.J.S.A. 2A:18-55 for use of the phrase "final judgment," and N.J.S.A. 2A:18-56 and -57 for use of the phrase "judgment for possession."

obtained, it would have clearly said so. Instead, the Legislature provided relief to otherwise beleaguered landlords by not denying them jurisdiction in a summary dispossess action even if required permits or approvals were not extant. Rather, while the lack of required permits or approvals would not disqualify an otherwise-entitled plaintiff to a judgment of possession, it would preclude the court from issuing its warrant for removal under *N.J.S.A.* 2A:18–57. Until and unless the plaintiff satisfies the court that it has in hand all necessary state and local permits or approvals, no warrant of removal will issue [8]. Although this will continue to involve the court in possibly protracted proceedings, contrary to the ordinary case management of a summary dispossess action, the party who will be primarily prejudiced is the landlord, for whom the speedy procedure was enacted. If the landlord sleeps on its rights and does not obtain all of its necessary permits and approvals in a timely fashion, it may not be heard to complain about the withholding of the warrant for removal and continued exercise of the court's jurisdiction and control.

██ But this analysis does nothing to address the circularity problem created by plaintiff's architectural and engineering studies. If this iteration continues, plaintiff will succeed in retiring this building only after the last tenant dies or voluntarily moves out. However, this is not the mandate of the statute. *N.J.S.A.* 2A:18–61.1b is concerned only with land use issues, not construction issues. This is evident from its creation of a presumption against permanent retirement if the *land use*

---

[8] Note that the six-month period for the granting of hardship stays, however, begins to run upon the entry of a judgment of possession. *N.J.S.A.* 2A:42–10.1. Nothing herein is intended to hold that such six-month period would be stayed by the failure of the landlord to obtain the necessary permits or approvals. To the contrary, if the landlord takes more than six months to complete its permitting, the tenant will enjoy the benefits of a longer tenure. If the landlord takes less than six months, the tenant may apply for a hardship stay up to a maximum of six months from the date of the entry of the judgment of possession.

*regulations* governing the parcel do not permit nonresidential use as a primary permitted use. The purpose of the statute is to preclude a landlord from evicting tenants where the ultimate nonresidential use is either not permitted or not yet approved. The statute does not encompass issues that are regulated by the Uniform Construction Code, *N.J.S.A.* 52:27D–119 *et seq.* Therefore, the actual obtaining of a building permit is not a prerequisite to removal of the tenants, but final site plan approval—which will validate the permitted nature of the use— is a necessary prerequisite to the issuance of a warrant for removal. (Of course, if the landlord is able to obtain a building permit without the necessity of final site plan approval, this ordinarily will be enough to satisfy the requirements of *N.J. S.A.* 2A:18–61.1b.) Thus, plaintiff will not find itself on a never-ending merry-go-round unless, through its own dalliance, final site plan approval is delayed.

### B.

### *Reprisals.*

Although defendants are entitled to rely upon the rebuttable presumption that this summary dispossess action is in reprisal for the tenants' activities under *N.J.S.A.* 2A:42–10.12, plaintiff has clearly and convincingly overcome this presumption. There is unrebutted evidence that plaintiff began its initial eviction activity in August 1986, well before most, if not all, of defendants' complaints about their living conditions. The court conceives of no basis to suggest that plaintiff's actions were retaliatory under the reprisal statutes. Perhaps plaintiff is fed up with the tenants, or worse, it believes that it may earn greater profits from the land if it is devoted to commercial use. Nevertheless plaintiff has not evinced any ill-will or bad faith towards the tenants which even remotely would qualify as evidence that this action is a reprisal. While it may well be true that plaintiff will not be inviting defendants to plaintiff's next Christmas party, the love lost between the parties is not of

a quality so as to deprive this plaintiff of the benefits of a summary dispossess action. Even giving defendants the benefit of the statutory presumption, the actions of plaintiff may be measured by simple tenets of capitalism, not machiavellianism.

## C.

### Notice to Public Agencies.

It is very difficult to be a landlord in New Jersey. In order to obtain the benefits of expedition inherent in the statutory summary dispossess vehicle, a landlord must hurdle a number of sometimes mindboggling procedural obstacles before obtaining a judgment of possession. This is the prize: a judgment of possession, but sometimes landlords avert their eyes from the prize only to stumble, and the prize eludes them. In order to earn such a judgment, the landlord must follow a carefully disciplined and orchestrated course; otherwise it may fall off the track and must return to the starting point. Although there may be doubt or debate as to the wisdom of this obstacle course laid by the Legislature, the statutory language is clear. As such, courts are powerless to assist a fallen landlord. *See Georgia King Associates v. Fraiser,* 210 *N.J.Super.* 146, 148 (App.Div.1986).

All of the provisions of the Anti–Eviction Act, *N.J.S.A.* 2A:18–61.1 *et seq.* must be read sensibly and *in pari materia. Lowenstein v. Murray,* 229 *N.J.Super.* 616 (Law Div.1988). Harmonization with an application of logic and common sense is the task of the court. It is neither for the court to invade the province of the Legislature by making what it may consider better sense of a statutory scheme, nor is it the court's role to robotically apply legislation literally without regard to fairness and pragmatism.

Landlords are not charities. They are not philanthropic entities who are in business to subsidize their tenants. Landlords are, however, generally speaking, honest business entities who are merely trying to achieve the American dream of profiting

from the ownership of land. The eviction efforts of landlords need not always be viewed skeptically and they never should be addressed by the court with a predisposition against the entry of a judgment of possession.

However, the Legislature has targeted certain practices of some landlords for special oversight and careful examination. For example, *L.*1978, *c.* 139 specially protects tenants in Atlantic City. So, too, is the 1986 amendment to the Anti–Eviction Act a legislative device that commands the Judiciary to cock an eyebrow, and place the conduct of landlords under special scrutiny. It is not this court's function to try to fathom every eventuality which the Legislature may have missed in a given statutory scheme and then mold some creative relief for the landlord who claims to be the exception to the rule. Rather, every landlord who seeks relief in a summary dispossess procedure must abide by and follow every rule set for it by the Legislature.

One of these rules is set out in *N.J.S.A.* 2A:18–61.1c which requires:

> Within five days of the date on which any owner provides notice of termination to a tenant pursuant to subsection g.(1) or h. of section 2 of P.L.1974, c. 49 (C.2A:18–61.1), the owner shall provide a copy of the notice to the Department of Community Affairs.

Another rule is the following, from *N.J.S.A.* 2A:18–61.1d, applicable in a rent-controlled municipality such as Fort Lee:

> Within five days of the date on which any owner provides notice of termination to a tenant pursuant to subsection g.(1) or h. of section 2 of P.L.1974, c. 49 (C.2A:18–61.1), the owner shall provide a copy of the notice to the municipal agency responsible for administering rents in the municipality. The owner's notice to the municipal agency shall also include a listing of the current tenants and rents for each dwelling unit in the premises, unless the owner has previously submitted to the municipal agency a listing which is still current.

Plainly, plaintiff violated these provisions, but now seeks to be immunized from its noncompliance by arguing that since it fully intends to truly retire its property from residential use on a permanent basis, it need not follow the five-day time period. In support of its argument is its claim that notice to the public agencies "only serves an informational purpose under the cir-

cumstances and substantial compliance is sufficient." Plaintiff is surely correct when it suggests that the notice serves an "informational purpose." What notice does not? Plaintiff's leap of logic that therefore "substantial compliance [9] is sufficient" merely begs the question of what did the Legislature intend?

Defendants contend that notice to the public agencies is required because Defendants are entitled to the comparable housing and relocation benefits of *N.J.S.A.* 2A:18–61.13 *et seq.* and 61.22 *et seq.* These arguments are patently without merit. First, *N.J.S.A.* 2A:18–61.13 *et seq.* clearly and convincingly applies only to tenancies located in Atlantic City. To devote any more discussion to this fanciful argument would tend to give it the appearance of having even a scintilla of substance. *See Plaza Joint Venture v. Atlantic City,* 174 *N.J.Super.* 231 (App.Div.1980). Second, *N.J.S.A.* 2A:18–61.22 (New Jersey Senior Citizens and Disabled Protected Tenancy Act) manifestly applies only to conversions of rental housing into condominium, cooperative, planned residential development, or separable fee simple ownership regimes. *N.J.S.A.* 2A:18–61.24(f). It has no applicability whatsoever to a situation involving the permanent retirement of a building from residential use. Logically, perhaps, this remedial statute—at least with regard to its provisions for comparable housing and relocation expenses—should be applied to the permanent retirement of a building from residential use. However, the Legislature has made it clear beyond cavil that protected tenancy status applies only in conversion scenarios. *See Edgewater Inv. Assoc. v. Edgewater,* 201 *N.J.Super.* 286 (Ch.Div.1984), aff'd in part, rev'd in part 201 *N.J.Super.* 267 (App.Div.1985), aff'd 103 *N.J.* 227

[9] The court specifically rejects plaintiff's claim that it "substantially complied" with the statute. If it had given the required notice to the public agencies six *days* or even perhaps six *months* after giving notice to the tenants, it could seriously argue for substantial compliance. But here, plaintiff delayed more than 18 months before making the public agencies aware of its actions.

(1986); *Prudential Ins. Co. of America v. Guttenberg Rent Control Board*, 220 *N.J.Super.* 25 (App.Div.1987).

Plaintiff, on the other hand, argues that the statute is designed to alert the public agencies so that if the landlord ultimately decides to renege on its representation to permanently retire the property from residential use, there will be a monitoring system available to protect the displaced tenants. As such, Plaintiff argues that it matters not *when* the notice is given to these public agencies as long as the agencies receive notice in time to allow them to set up an administrative scheme to protect the tenants in the event the landlord decides to resume residential use of the property. Plaintiff claims that giving the notice on the very day that the instant complaints were filed does not do violence to the purpose of the statutory scheme, and its tardiness should be ratified. Plaintiff also argues that the lack of timely notice to the public agencies has not directly prejudiced or visited detriment upon any of the individual defendants.

The court well recognizes the Legislature's purpose in enacting *L.* 1986, *c.* 138. It was designed to prevent landlords from making an end-run around protected tenancies by disguising conversions in the costume of a permanent retirement[10]. The stringent notice provision of the statute may have been intended to give the administering agencies early warning of the displacement of tenants so that if government so wishes, social welfare machinery could be provided to assist them. Alternatively, it could have been designed to create early tabulation of permanent retirements so that the Department of Community Affairs would be in a well-documented posture to report to the Legislature concerning the operation of the statute and wheth-

---

[10]Notwithstanding plaintiff's earnest claim of acting in good faith, it is wholly premature to judge its conduct until the permanent retirement from residential use is completely accomplished.

er additional (or lesser) protections are necessary[11].

Even if this notice statute has been violated, what is the penalty? In a permanent retirement from residential use situation, *N.J.S.A.* 2A:18–61.2(d) provides for the express written termination notice to be provided to tenants at least 18 months before institution of a summary dispossess action. This statute is fundamentally a procedural and jurisdictional provision that needs little explication. *Harry's Village, Inc. v. Egg Harbor Tp.* 89 *N.J.* 576 (1982); *Kroll Realty v. Fuentes,* 163 *N.J.Super.* 23 (App.Div.1978); *25 Fairmount Ave., Inc. v. Stockton,* 130 *N.J.Super.* 276 (Cty.D.Ct.1974). Is it necessary to additionally burden the landlord with the ghastly penalty of having to reserve its tenants with 18 months notice before instituting a summary dispossess action because of violations of *N.J.S.A.* 2A:18–61.1c and –61.1d? Unfortunately, the answer is yes.

The principle of harmonization of a comprehensive statute such as the Anti–Eviction Act compels the court to find that each element must have a purpose and an enforcement quotient. The court has already discussed the purposes of the five-day notice provision. This provision's enforcement quotient contains the inherent penalty that noncompliance will affect the landlord in the place that hurts the most: a summary dispossess action. Since no other penalty is provided for noncompliance, and the Legislature is presumed to be aware of the burgeoning case law which strictly enforces the time and notice

---

[11]Plaintiff presented the testimony of two representatives of the Division of Housing, Department of Community Affairs who stated that since the 1986 amendments of the Anti–Eviction Act, approximately six notices under subsection h. have been filed with the division. At the present time the division merely files these notices and does not act in any manner whatsoever upon them. Plaintiff also produced the administrator of the Fort Lee Rent Leveling Board who testified that plaintiff's notice, received in January 1989, was the first such notice ever received by her agency and that when it was received she had no idea why it was sent to her or what she was supposed to do with it. Notwithstanding this benign neglect by the public agencies, plaintiff has failed to satisfactorily explain its lack of timely filing.

provisions of the Anti-Eviction Act against tardy parties, *A.P. Development Corp. v. Band*, 113 *N.J.* 485 (1988), the only logical conclusion is that the Legislature intended the harsh penalty of dismissal of a summary dispossess action to apply if *all* related notice requirements of the Anti-Eviction Act are not followed. If the Legislature wanted to impose some other penalty, it would have so provided. *Cf. N.J.S.A.* 2A:18-61.1e (civil penalty and treble damages available where landlord blunders). This penalty is not as arbitrary as it may seem at first blush, since compliance is so easily accomplished. All that is necessary is for the landlord to mail two notices, which may be readily accomplished at the same time as plaintiff gives its *N.J.S.A.* 2A:18-61.2(d) notice of termination of the tenancy to its tenants. This does not require a landlord to jump through a proverbial hoop to reach its prize of a judgment of possession. Rather, it asks very little of landlords—a mere ministerial act—and they, of all persons, should find compliance easy.

The court should not be placed in the awkward position of determining whether a notice on the 6th day, 6th month, or 18th month is "substantial compliance." This issue should never arise. The legislation is clear and unambiguous. The court is not in a position to second guess or make a better world for plaintiff than the one in which it finds itself as created by the Legislature. If remediation is necessary to relieve plaintiff of the harsh result ordered in this case, that is for another sphere of government, not the Judiciary. The statutes under consideration here are plain, straightforward, and serve legitimate purposes of public policy. The court will not disturb the judgment of the Legislature, especially in such a simple scheme when plaintiff has failed or neglected to follow the command of the law. Indeed, planning by individuals and businesses alike would be frustrated if courts failed to give predictable effect to the plain language of statutes, simply because of an error or ignorance of the law. *Cf. General Trading Co. v. Taxation Div. Dir.*, 83 *N.J.* 122 (1980).

## V.

### *Conclusion.*

Based upon the foregoing, the complaints shall be dismissed. To borrow a concept and paraphrase from the Supreme Court in another context, when dealing with tenants, landlords must turn square corners. *See F.M.C. Stores v. Morris Plains,* 100 *N.J.* 418, 426 (1985).